In the Matter of MOSES N. SCHLEIDER, an Attorney, Respondent.

First Department, January 10, 1930.

*Isidor J. Kresel,* for the petitioners.

*Benno Lewinson,* for the respondent.

DOWLING, P. J.   The respondent was admitted to practice as an attorney and counselor at law in the State of New York in January, 1900, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department.

The petition charges, on information and belief, that the respondent has been guilty of misconduct as an attorney at law, as follows:

(a) For many years last past the respondent herein was engaged in the solicitation of contracts and retainers from persons injured in accidents retaining and authorizing him to act as their attorney to collect damages sustained by them as a result of such accidents and to bring suits at law in their behalf to recover such damages.

(b) For many years last past the respondent employed divers persons, not members of the bar of the State of New York, who with his knowledge and approval, solicited and procured contracts and retainers from persons injured in accidents, retaining and authorizing him to act as their attorney to collect damages sustained by them as a result of said accidents and to bring suits at law in their behalf to recover such damages, and the respondent paid or promised to pay the persons so employed by him various

sums of money as salaries, fees, commissions or compensation for the services rendered by them in soliciting and procuring said contracts and retainers.

(c) For many years last past respondent promised and gave divers persons, not members of the bar of the State of New York, valuable considerations for inducing persons injured in accidents to retain him as their attorney for the purpose of bringing actions or suits in their behalf to collect money damages claimed to have been sustained by them as a result of said accidents or to represent said claimants in the pursuit of their civil remedies for the recovery of their claims.

The respondent has filed no reply to the petitioners' petition. But in the brief filed on his behalf it is stated: " To the extent to which the record, as here and thus presented sustains the charges, he here admits his guilt."

This is one of the disciplinary proceedings growing out of what has been termed the "Ambulance Chasing Investigation." During the course of that investigation conducted by Mr. Justice WASSER-VOGEL pursuant to the order of this court entered February 7, 1928, the respondent was called and sworn as a witness. Extracts from his testimony follow: " Mr. Kresel: Q. Will you describe the system that is now in vogue of getting the personal injury cases, and, if there is more than one classification, will you classify them for us? Respondent: A. Yes. There is one way of getting personal injury cases, the same as any other attorney gets his practice; by a client coming to the office, or a man coming to the office. By the Court: Q. Yes. There is another way, is there? A. Oh, yes. I am going to continue. Q. Go ahead. A. The smaller cases can be gotten that way. Another way is where a man works in the lawyer's office and will, either by consent — by the attorney to get a case, either because it was recommended, somehow recommended, or because the attorney would like to get the matter. There is another — well, there are two more ways. The third is to work in the employ. An attorney will employ a man for the purpose only of getting cases. The fourth way is that there are laymen who will, for a money consideration, bring a matter into the office. That is all. By Mr. Kresel: Q. The last method you differentiate from the third method in this: That the layman in the last method is not regularly in the employ of the lawyer? A. We l, yes, that man can be. From my understanding of it that man can be a regular employee, because he is — Q. No. Let us not go into the ' because,' because it will take too much time. A. No, that man is not in the service of the attorney because he is free. He is a man who claims he is free to sell his case to whomever he wants. Q. Yes. In other

words, a lawyer would have in his employ a man whom he would send out to solicit cases. A. Yes. Q. Another way is that a layman not attached to any particular lawyer's office would in some way get cases and bring them to the lawyer and give them to him for a consideration? A. Not necessarily to the same lawyer, in the four classifications. Q. Yes. You mean that he would not confine himself to any particular lawyer? A. Not only that. He claims at the outset that he is not sold to any particular man. He is what is known as a free lancer. Q. In your profession, in your own practice, which of these systems did you follow? A. Well,— our cases, or rather my cases consist of fifty cases of the value of $250.00 to $1,000 against five cases of twenty five hundred and up. The cases of small injuries which come in without having any trouble either way, except if the clients are working people, it is the custom always to send someone to their house, and send a man who is employed that does that kind of work, and he does what he is told. For the larger cases you must have, if you intend to use judgment and have a chance to get them, whether they are recommended or not, a man who is able to compete with those men who are getting cases for other lawyers, because it is the custom if an accident happened, that it can be a relative of the very lawyer, his own brother, that can be asked to send out to get a case, and you will find four men in the room by the time you get down there. When I say ' you ' I mean some representative of a lawyer. Q. You mean who are — A. Four men from other lawyers. Q. For the purpose of getting that case? A. For the purpose of getting it, yes, soliciting it. And you will have to have a man for that case who is able not only to talk but who knows something about — knows how to give a good word for his own client and at the same time is able to take care of himself and say, ' Now, here I have been sent for this case. These people know me '— you know what I mean. And if he is able to do that, he gets the case if he is recommended, and if he can't do that, he don't get it no matter how much he is recommended."

He separated the cases in respect to the seriousness of the injury. Speaking of minor injuries cases, respondent testified: "A. Well, they may have to be solicited, but as a rule minor injury cases are not solicited by men who understand much about the personal injury game, if they have — not a continuous effort, because those cases they may get without effort. By minor injury cases I mean about from $750.00 down. Q. And serious injury cases you say as a rule are solicited, and have to be solicited because of competition? A. In substance, yes. Q. Because of the competition of others? A. And whether they are recommended or not. When I

use the word solicited, I mean you must send a representative of your office to hold your ground and make your headway and make sure that any one else who is there will not hurt your reputation, or even to protect the case after you get it signed by sending a man a day or two afterwards, being there to see that no one comes, asking them how they are, and so on, when the real object is to see that no one comes."

As to his own method of getting cases, and with the questions directed particularly to his practice, the respondent testified: "A. When I use the word ' getting ' I mean to say receiving cases. Q. In your practice you have employed and sent out solicitors to get business, have you not?  A. Well, I won't say that I employed solicitors.  In my practice I have employed men whose duty were to do everything in and about the office and sometimes they would go and obtain cases.  What they did, is however, something to be construed and I won't say what they went to solicit or did not go to solicit.  Q. Of course, Mr. Schleider, you do not tell me, and I assume you can not tell me from your personal knowledge—  A. I do not—  Q. No, wait just a moment.  But I am interested with respect to the instructions that you gave.  Is it not a fact that in your own practice you have sent employees from your office to solicit personal injury cases?  A. Well, I would classify it in this way: The cases that I knew were recommended, whatever we would get — a postal or telephone or message — I usually would send, yes, sir —  Q. Well, I am asking about your instructions.  A. But outside cases, cases that I had no — I mean cases where I would not know anything about it, I will not say that there were not rare instances where the office would not send a man in the general employ of the office to get a particular case.  I want to be very frank with you, because it hits me —  Q. That is what I thought.  There were instances then, in your own practice? A. Yes, there were instances.  I will answer it fully for you.  There were instances in my practice, where, if we would read in the newspapers and find out that a substantial case existed, that Mr. Silver, who was in my office, would go up with a man in my office, if he were able, to help him, or with another man if that man could not help, and we would try to get the case, even if we were not recommended to it.  I want to add to that that there were rare instances, but it would be done in a really important injury case.  Q. Besides learning of cases through newspapers what other source of information did you have which led you to this practice of sending people to solicit a case?  A. I had none, but I do know that there were ways.  There were ways in which I believe some of the men that were with me a short time and whom I would now class as men

who were on a class different than the ordinary average clerk, who would get information from a hospital or a policeman, and they would go out on it, but I want to add to that that in those cases it was very hard for the men who paid those men to get, because they were crooked and sold these cases to other lawyers while they were working for you — not in all instances, but in some. Q. We have it this way, then: That cases would be solicited where information of the existence of such cases came through the newspapers and where they came through attaches of the hospital or policemen? A. Well, not to my knowledge that way, but I have found out that it did come through that way through Mr. Silver in the office."

Respondent testified that he employed Joseph Silver who is a member of the bar.

On the question of employment of " runners " respondent testified: " Q. Of course, you have heard the term ' runner ' used? A. Yes, I have heard that. Q. In connection with this negligence business? A. No question about that. Q. Give me the names, if you please, of those runners that you employed in the last five years. A. I would not say that I employed in the last five years who were to my knowledge runners, but I would say that I have employed men in the last five years, who, after they left me, or after I got through with them or discharged them, whatever it was, I would call runners who get — Q. That is, I understand you to mean, that while they were in your employ, you did not know that they were runners? A. Well, I would go further than that. Q. But you discovered that after they left you? A. No, I believe that I discovered that while I — before I got through with them, that they were men of the type that one would call runners, but while I hired them, and while they were working for me, I would not say that they would do what would be characterized as running."

After explaining the hiring and discharge of certain employees, respondent testified: " Q. But that was not what we were discussing. I asked you what runners you used. I understood you to say that you did not use runners. I am trying to find out now what you meant by that. A. I did not use men who were runners because they did not run for cases. They did everything in the office and also went for a case to get it. Q. That is what I thought. These men did go out to solicit cases which were published in the newspapers did they not? A. Yes. Q. Is that not running for cases? A. Well — maybe it is, but in my contemplation — no, I won't add that. I will concede that. My contemplation of a runner is a man whom you can't tell to do anything except that he comes in on a salary for his check, and he brings you a case once or twice

a week, and if you don't like them, ' Very well, I will go elsewhere.' He does nothing else but bring them in. That is my idea of a runner. Q. What you mean is that these men who did do running and did solicit cases were in the employ of your office and that you could direct them to do other work? A. No, I mean the reverse, Mr. Kresel. I mean that I had these men to do work in our office. Q. Yes. A. To do anything that they were told to do. I do not say that all of them were all the same — these three men that I had in mind, I do not say were of the same quality. Those I hired that came through insurance companies were a better type of investigators, but these men were not hired by me as runners but they were hired by me to do work in the office and investigate, bring witnesses in a case that is on trial. It is hard to get them to bring witnesses and subpœna them, and they don't want to come. Q. I understand. You hired them for general service? A. That is all. Q. But you do not deny that while they were in your employ they did run and solicit cases? A. Well, I will eliminate the word run, but I will say that some of their work consisted in efforts to get cases. Q. When I say solicit cases do you not understand what I mean? A. I do understand, but I — Q. Did they not solicit cases for you? By Judge WASSERVOGEL: Q. Did they ask for and obtain cases? A. Yes, put it that way; they asked for and obtained cases — I mean in rare instances."

Respondent testified that he had 500 to 600 accident claims in his office each year and of this number two-thirds " were sent for and obtained." He was reluctant to admit that these were solicited.

" Judge WASSERVOGEL: He does not like your word ' solicited.' Q. Well, were sent for and obtained? A. Were sent for and obtained. In results it might mean the same thing, but it don't hurt to have it my way. Mr. Kresel: That is all right. By Judge WASSERVOGEL: Q. Then you say from three to four hundred each year were sent for and obtained? A. I would say two-thirds of it, whatever it was. If the number was 600, it would be 400, and if the number was 500, that is it."

He testified to an arrangement with Samuel D. Bierman, an attorney in his office, and further, that his office force had been materially reduced in the past three years, and named the men who had been in his employ in the last five years; they were Hyman Epstein, a Mr. Miln, Irving Wolf, David Schaffer; none of these except Epstein is a lawyer. He also had a Mr. George Fine, Mr. Jesse Cramer, Max Turshen, and when Turshen left he had another fellow by the name of Hatch, who was a law student and passed his examination, and Murray Wolf. All did work other than that of going out and getting cases. Respondent further testified:

"A. Eliminating the female help, I will not say that every man whose name I have mentioned at some time or other did not when the occasion required it — or put it another way: when he thought that a case — I will eliminate the word ' case '— or when he knew a case was to be gotten, that he did not get out and get. By that I do not mean that he went out to solicit a case in the sense that the word ' solicit ' is used."

He admitted to a method of some laymen who make it a business to roam around and get control of cases and then take them to the lawyers and sell them. He named one such man, Tony Sigony, but denied that he had ever been given a case by Sigony.

Speaking of the competition for cases, he testified: " Q. Again to reduce it to simple language, you mean that these serious injury cases, as a rule are in the control of solicitors who solic't business for particular lawyers? A. I would say right, except I would say expert solicitors. They must be very competent. Q. Lawyers not equipped with the services of equally expert solicitors have not a show for those serious cases. A. Even though he were more able than the man for whom the expert solicitors work. Q. Even if he were more able as a lawyer. A. Yes, sir. Q. In other words, it is the expert solicitor that gets the serious injury cases? A. A good lawyer — I mean to be frank — the ability and honesty or integrity of a lawyer is not the test that has anything to do with the getting of the retainer. Q. In these serious cases? A. Yes, sir, a retainer can be had for a young fellow, twenty four, I mean obtained for a fellow twenty four without experience, by a man who wants to go out and get it than for a man forty or fifty years — I mean an attorney,— forty or fifty years, with real good experience, because it is the salesmanship, I am sorry to say, it is the salesmanship of the man who gets the retainer and not the ability of the proposed lawyer. Q. What sales talk does one of these expert solicitors use as long as we are talking in terms of salesmanship? A. To be frank — not that I am a good man or bad man — but I am always too much of a coward — if you leave that personality aside and actually go through an experience of this kind, because there is a lot of rough work a lawyer must get into if he should personally try to get a case, even though it were his own friend and relative, if some man would want to get it for some one else, and the idea is that man will sell the proposed attorney just the same as he would as a salesman would sell an automobile, I am not a good salesman to sell an automobile or any other commodity. Q. You mean by stating the results that the lawyer had obtained in other cases? A. I would add by misstating. Q. I was going to say, whether true or untrue. A. Exactly."

And again, respondent testified: " Q. When you started to get a considerable amount of negligence business did you find that you had to make use of these runners? A. Well, I will be frank, I found — I found that I had to use — I found that I had to employ more or less men who would do the general work in my office and who would to some extent understand something about either protecting a case when I got it or some times get a case if I knew of a source or if it was a regular case, otherwise it would be hard to hold a case or get it, even though you were entitled to it without soliciting it and after these men were in my employ for short periods the salary that I would pay them for say, eight or ten hours' work of a general nature was no longer attractive because I would start him with $35 or $50."

On further examination he said: " Q. Let us see about that, Mr. Schleider. Didn't you send out your employees to solicit cases about which you had learned from the newspapers? A. Well, I believe in some instances, in one or two instances I would discuss with an attorney in my office some cases that we noticed in the newspapers and I will be frank, I believe that they did go and get — that he would go, or perhaps a layman or clerk get that case and I do not think that the chances of success, even though you knew someone connected with the family or anybody was great, because the competition was very large in getting the retainer. Q. That is just it, because of the competition didn't you find it necessary, in order to get a share of this business to send out this man that you speak of, a lawyer in your own office and other employees in an effort in competition to get a particular case? A. To be frank, I won't say that it was proper or improper, but I would say that in a very important case, if one thought he could get the retainer perhaps he would go and try to get it, but the percentage of getting it was one out of fifty due to competition."

On the question of buying off laymen, respondent testified: " Q. Then you found in the course of getting cases, negligence cases, did you find yourself in competition with lawyers, and also laymen who had control of the cases and that you would then have to buy off the laymen so that you could get the case? A. That has happened more than once, very often that has happened, yes, yes. Q. In such instances, would you have to give the layman a share of the recovery or cash consideration? A. No one gets a share of the recovery from me. That is sure. You may call me a mean man in that respect, except an attorney who would give me a matter, but there are instances where, well, to use a rough expression, a man butts into your affairs, or intends to hurt you in a situation where you feel that you are in the right and you have been retained

and well, right or wrong, you might give him something, some money consideration to step out or assist you where no assistance would be necessary, if a wrong was not intended. Q. You are dealing so much in generalities there, I am trying to get a specific fact. A. Sometimes you would have to give a layman something, call it for his time or for any other reason because he would otherwise hurt your interest in the matter where you have been retained or about to be retained, even though it is a friend or even a relative. Q. In other words, you have had instances where you were seeking a retainer in a particular case and found that a layman stood in your way and you had to buy him off, in plain language? A. Well, yes, buy him off for not interfering, that is about what it is."

He also testified to cash considerations being paid to laymen in addition to a percentage of the recovery. But the testimony does not indicate that he did so.

On the question of what was paid, he testified: "A. I hired a man starting with $25 a week, and then they jumped to sixty."

For a few months he paid up to $100 a week. He was then asked to add $20 for automobile services and he got through then.

He said he would start his men with $35 or $50 a week, and after a year or so he might make $75 or $100, that is the highest he ever paid.

Many character affidavits or certificates are offered on his behalf.

On behalf of respondent, his counsel urges that respondent ceased from the condemned practice a year or so before the first complaint was made to this court.

We are of the opinion that the respondent should be suspended from practice for the term of one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

FINCH, MCAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent suspended for one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.